[No. 2911.]

## WALTER MORGAN v. THE STATE.

PRACTICE   HEARSAY TESTIMONY.—A medical witness, having expressed his opinion as to the cause of the death of the deceased, was permitted, over the objection of the defendant, to testify that other physicians in attendance at the *post mortem* examination concurred with his opinion.

*Held*, that the evidence was clearly hearsay and inadmissible; but, in view of the fact that the other physicians were subsequently introduced as witnesses and testified in person to the same effect, the error was immaterial.

2. MURDER — IMPLIED MALICE — REASONABLE DOUBT.— CHARGE OF THE COURT instructed the jury as follows: "Implied malice is an inference or conclusion of law upon certain facts found by the jury. Thus the law implies malice from the unlawful killing of a human being, unless the circumstances make it evident that the killing was either justifiable, or, if not justifiable, was so mitigated as to reduce the offense below murder in the second degree." *Held*, error; not because it shifts the burden of proof, but because it infringes upon the doctrine of reasonable doubt, and authorizes the jury to apply the doctrine in behalf of the State, to the extent that the evidence should show, beyond a reasonable doubt, the existence of such facts as would justify or mitigate the homicide, instead of authorizing the jury, as it should, to apply it in behalf of the defendant, to the extent that the evidence should, beyond a reasonable doubt, establish the existence of malice. See the opinion *in extenso* on the question.

3. SAME—CASE OVERRULED.—In so far as the rule announced in the case of *Sharp* v. *The State*, 6 Texas Court of Appeals, 650, is in conflict with the doctrine above announced, that case is overruled.

4. SAME.—It is urged by the State that inasmuch as the court charged the jury to acquit if they had a reasonable doubt of the defendant's guilt of murder in the second degree, the error in the charge quoted was immaterial. *Held*, that the two charges are in direct conflict, and as the defendant promptly excepted, his exception must be sustained.

5. SAME—HOMICIDE AS RESULTING FROM AN ORIGINAL INJURY OR SUBSEQUENT NEGLECT AND MANIFESTLY IMPROPER TREATMENT.— See the opinion of Judge Hurt for subdivisions twelve and thirteen of the charge of the trial court upon the subject of homicide, respecting the question whether or not the death of the deceased was the result of the original injury inflicted by the defendant, or whether it was the result of subsequent neglect and manifestly improper treatment of other persons, which charges are *held*, by a majority of the court, to embody the common law rule upon the subject, and to be inapplicable in this State, because the same has been changed, modified and ameliorated by statute. See, on the subject, the several opinions of Judges Hurt and Willson, and Presiding Judge White.

6. SAME—DEFINITION OF HOMICIDE.—The term "homicide" is more specifically defined by the statutes of this State than by the common law. Our Code defines homicide to be the destruction of the life of one human being, by the act, agency, procurement or omission of another. Such destruction of life must be *complete*, and complete by the act, agency, procurement or omission of the defendant.

7. SAME—STATUTE CONSTRUED—CAUSA MORTIS.—Article 547 of the Penal Code reads as follows: "The destruction of life must be complete by such act, agency, procurement or omission; but although the injury which caused death might not, under other circumstances, have proved fatal,

yet, if such injury be the cause of death, without its appearing that there has been any gross neglect or manifestly improper treatment of the person injured, it is homicide." Construing the words "but although the injury which caused death might not, under other circumstances, have proved fatal," the majority of the court hold that they refer to all injuries which, under the circumstances of the particular case, may not be necessarily fatal, but may cause death, and not to such injuries as must, inevitably, cause death. Otherwise stated: If the injury be such that death is not a certain result—if it be such that human aid and skill may prevent its fatal termination—then it is such an injury as comes within the meaning of the words quoted. But if the injury be such that no human aid or skill could prevent its fatal termination, then the injury is not such as comes within the meaning of the words. For an exposition of the principle, see the opinion of Judge Willson.

8. SAME.—Article 547 of the Penal Code, in effect, provides that an injury which, though not necessarily fatal in itself nevertheless terminates in death, when death might have been averted by timely aid and treatment, is homicide by the act of the person inflicting it, unless it appears that there had been gross neglect or manifestly improper treatment of the person injured by some other person than he who inflicted the original injury. Herein consists the important change made by the statute in the common law rule. At common law, the neglect or improper treatment must produce the death in order to exonerate the person who inflicted the original injury. Under the statute it is not necessary that the neglect or improper treatment shall contribute in any degree to the death, but if there be gross neglect or manifestly improper treatment, either in preventing or in aiding the fatal effects of the injury, the death of the injured person is not homicide by the party who inflicted the original injury.

9. SAME—"GROSS NEGLECT AND IMPROPER TREATMENT," as construed by the majority of the court, are held to mean, not only such as produce the destruction of human life, but as well such as allow, suffer or permit the destruction of life. This construction is fortified by Article 548 of the Penal Code, which concludes as follows: "If the person inflicting the injury which makes it necessary to call aid in preserving the life of the injured person shall wilfully fail or neglect to call such aid, he shall be deemed equally guilty as if the injury were one which would immediately lead to death." See the opinion of Willson, judge, for an elaboration of the principle.

10. ASSAULT WITH INTENT TO MURDER.—The construction placed upon the statutes referred to would not operate to shield a defendant from all punishment for his criminal act, but an indictment for murder, as in this case, if supported by proper and sufficient evidence, would support a conviction for assault with intent to murder. See the statement of the case for evidence *held* to demand a charge upon the law of assault with intent to murder.

11. SAME—JUSTIFIABLE HOMICIDE—CHARGE OF THE COURT upon the question of justifiable homicide required the defendant to resort to all other means, except flight, of preventing the threatened injury to himself, before taking life, regardless of the imminence of his peril. *Held,* error under the facts in proof.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The indictment in this case charged that in the county of Travis, State of Texas, on the nineteenth day of January, 1883, the appellant killed and murdered one Joseph Henderson, by stabbing him with a knife in the face and temple. The trial resulted in the appellant's conviction of murder in the second degree, and a term of five years in the penitentiary was the punishment assessed.

W. B. Hawkins was the first witness for the State. He testified that he saw the defendant at Cloud's stable, in the city of Austin, on the night that Henderson, the deceased, was hurt. About half past seven o'clock on that night the defendant rode into the stable, and witness told him to get down. He replied that he did not want to get down. He then rode through the stable towards the wagon yard, and engaged in a wordy interview with the yard master, a man named Wilgus. The witness heard the man Wilgus call for the police, and stepped out of the stable office. He then saw Wilgus running towards the stable, and the defendant after him on the horse. Witness met the defendant near the west door of the stable, and told Wilgus to go back into the yard, which he did. He then told the defendant to go out, and took the horse by the bridle, and told Buck Watkins to tap the horse behind, which Watkins did. Just as witness got near the door, leading the horse out, Henderson came in and he and the defendant spoke to each other, calling each other, the witness thinks, "pard." Witness supposed they knew each other. The defendant said that he wanted to see Sam. Cloud, and witness went to call Cloud, telling Henderson to hold the horse and back him off the cistern. The horse was cutting up. Witness went up stairs to call Sam. Cloud, and just as he and Cloud got to the door of the office, returning, the witness saw Henderson fall, and the horse go out at the door.

When the witness told Henderson to take the horse and back him off, the animal was standing on a cistern that had a heavy iron top. The witness had seen a mule lift this top off. The horse was captious and the witness was afraid he would uncover the cistern. Witness heard Henderson tell the defendant to get down from his horse and go into the office to the fire. He, Henderson, asked witness not to turn the defendant out, but to permit him to stay in the office. Some remark, not addressed to

the witness, was made about a girl. Witness saw Henderson just as he struck the ground, falling backwards. Witness saw nothing strike him. Witness thought the action was brought about by fun, and told Henderson to get up. Witness then saw blood running from his face, and called to an old negro to help sit Henderson up. The defendant was just out of the door when the witness stepped into the stable on his return. Witness went direct to the telephone to call for the police, when the sash (window?) was kicked in. At this time there was a crowd around Henderson. When the sash fell in, the witness thought some one was shooting at him. Witness saw a wound on Henderson's left temple. It was a gash, and rose and fell like a pulse. He did not notice or answer the witness when the latter spoke to him. The deceased was taken up stairs to Mr. Cloud's room on Saturday, and to the hospital on Monday. The defendant made some remark as he rode off, which the witness did not understand.

This witness was subjected to a very rigid cross-examination, detailing at length the incidents of the tragedy, but producing no very material variation from the narrative in chief. He could remember the presence of no one besides the parties named. Daugherty, Langford and Albin were about the premises somewhere, but if they were in the neighborhood of the difficulty the witness did not know it. The witness was somewhat provoked when he undertook to lead the defendant's horse from the stable. He did not remember that Morgan complained that it was too cold to go out, nor did the witness remember that he so testified on the examining trial of this case. It was the impression of the witness that when Henderson first came up he put one hand on Morgan's leg, and the other on the horse's mane. Witness remarked to Henderson: "Joe, hold his horse until I see Captain Cloud; take him off the cistern." Henderson took hold of the horse about the time that witness let go, which was when the defendant said that he wanted to see Cloud. At that time the horse had one foot on the cistern, and the witness thought him, the horse, in danger. The cistern was six or eight feet north of the stable door. The horse was facing north, and was fretful and excited. The witness started with the horse straight through the stable north door, which is a double door, one side of which was closed. Witness had led the horse nearly to the front door when the defendant said that he wanted to see Cloud. It was now that Henderson appeared. The defendant was cursing a

great deal, mostly at Buck Cloud. When the witness let the horse go, he got back to the cistern, and it was then he got his foot on the cistern. The cistern top was much like an oven lid, was heavy and hard to raise, but the witness once, and only once, saw it raised by an animal—a mule—and that time it was turned completely upside down. The witness had often pulled the cover off with his hand, but it was very heavy. It would bear the weight of a wagon, hack or buggy. Wagons had been driven over it. Witness remained no perceptible length of time up stairs. He told Cloud to come down, and immediatrly returned, and as he stepped into the stable he saw Henderson falling. He was the first man to reach Henderson after he fell, calling old Tony, a negro, to help. The two raised Henderson up.

When Henderson fell, the defendant went out at the front door of the stable. Witness picked Henderson up, sat him up, and went to the front door just in time to catch sight of the rump of a horse which he took to be the defendant's horse. Then witness went to the telephone in the office, thence to the safe, and it was then the breaking of the glass made him think some one was shooting. Some of the fragments of the glass struck the witness, and he thought he was shot. Six panes of glass were broken. When the blind was kicked to, breaking the glass, the witness was at the safe, trying, ineffectually, to insert the safe key. Witness got behind the desk when the glass was shattered, knowing that he could not be shot at that point, through the window. Witness did not retain that position longer than a minute. The defendant was arrested there, on the premises. Doctor Stalnaker arrived about a half hour after Henderson was cut. He washed the blood from Henderson's face, bathed his head, and inserted his finger into the wound and extracted some blood, and then bandaged the wound. He made no examination for skull fracture that witness was aware of. Doctor Stalnaker was with the wounded man when the witness left to go to his home, just north of the Capitol grounds. Witness returned to the stable about nine or ten o'clock that night. Witness could not remember whether it was Tuesday or Wednesday night after the cutting that Henderson was taken to the hospital. Witness attended to his business at the stable on Sunday, Monday and Tuesday, and went home at night. If counsel understood witness to say, on his examination in chief, that he was with Henderson constantly from the time he was cut until he died, they

were mistaken. Witness supposed that he went up stairs to see Henderson on an average of fifteen or twenty times a day while deceased was at the stable, wounded, and visited him twice after he was taken to the hospital. Witness was not present when the physicians operated on the back of the deceased's head. While he lay wounded, in the stable, Henderson was attended by first one stable hand and then another, and most of the time by a lady, who staid up stairs.

If, after Henderson came into the stable, the defendant ordered him to stand up against the wall with another man, it was after the witness started up stairs. The defendant said something at the door about "getting" somebody, which the witness did not understand. Witness did not hear him say: "If anybody wants me, come here and get me." If Henderson was drinking that night witness did not notice it. At all events, he was all right at the time he came in. It was the recollection of the witness that the stock had just been attended to, and that he had not missed Henderson from the stable. From the way Henderson talked, witness thought that perhaps he might have had a dram. Henderson came into the stable at the east door. The Scandinavian saloon stood just across the street, but witness could not tell whether or not Henderson came from there, as he first saw him as he came in the stable door.

The witness was asked if it was not a fact that, without anything being said, Henderson walked up to the defendant's horse, caught him by the bridle with one hand, laid the other on his mane or on the defendant's knee, and was asked by defendant: "Do you live at Cloud's stable?" and answered: "I work here," and was then told by defendant, "You stand over there by that other man," meaning Buck Watkins? The witness answered that he witnessed no such scene and heard no such conversation. It was the impression of the witness that Henderson spoke first, saying "halloa pard," and that the defendant replied, "I believe I am your pard." If Henderson took hold of the defendant's horse before the witness let go, the witness did not know it. It was the witness and not Buck Watkins who led the defendant's horse towards the stable door, and it was Buck Watkins and not the witness who tapped the horse behind. Witness did not order Buck Watkins to beat the horse out of the stable, nor did he order Watkins to interfere with the horse in any way until the defendant raised the difficulty with the yard man. Witness did not see Watkins until the defendant and the yard man came up

from the yard. Witness did not remember that Watkins was then leading the defendant's horse, and that defendant asked Watkins if he belonged to the stable, and on Watkins answering in the affirmative, that he said "Then I will go anywhere with you." Witness and Henderson both asked the defendant to get down. If Watkins also made such a request, witness did not hear him. When the defendant first came into the stable the witness thought he wanted his horse put up. Witness then saw that he had been drinking, asked him to get down, intending to take care of him the best he could, or to get rid of him if he was too drunk. Witness went back into the office as defendant rode into the yard, and came back into the stable when he heard Wilgus calling for the police. He then saw the defendant, who had stopped, walked up to him and told him he must keep quiet or leave the stable. Defendant replied that he "would do as he d—d pleased." Witness then, under the apprehension of trouble, told Watkins they must get him out of the stable, and to tap the horse while he, witness, led him out.

In answer to a question, the witness stated that he had testified once before about this case. If he then testified that he told Buck Watkins to lead the defendant's horse out of the stable, and that he, witness, slapped the horse on the rump, he did not remember it. His recollection was that he testified with regard to the matter just as he now testifies. At all events, he testifies now without reference or regard to his former testimony. It is the misfortune of the witness to have a poor memory.

On re-direct examination, the witness stated that when the defendant first rode into the stable, he asked him to dismount, and defendant replied: "It is none of your d——d business." Witness then returned to the office, and came out again when he heard Wilgus calling for the police. Defendant was then cursing Wilgus for something about a girl. It was then that the witness caught the bridle and told Watkins to tap the horse. Witness and Cloud witnessed the arrest of the defendant by officers Thorp and Johnson. Cloud pulled the defendant off his horse.

Buck Watkins was the next witness for the State. He testified that he lived in Falls county, Texas. He was at Cloud's stable at the time Henderson was cut, having arrived there two evenings before from Arkansas. The defendant rode into the stable about half past seven o'clock on the night of January 19, 1883,

and asked for Buck Cloud, Witness told him that Buck Cloud was in Arkansas. He then asked for some one else, the witness did not remember who. Witness asked him to dismount. The defendant then engaged in a conversation with the yard man, called "Dutch John," and the witness walked off, and defendant went into the back yard. Dutch John came back shortly and called for the police. Witness then returned and took hold of the rein of defendant's horse, stopped him, and told the defendant that his conduct would not do, and that he had better let the witness put his horse up. Defendant replied that he would do anything the witness advised him. Witness again advised him to get down and have his horse put up. Defendant replied that he did not want to do that; that he wanted to go home. Witness then told him that he had better go before he got into trouble. Witness then started to lead the horse out of the stable, and Mr. Hawkins, who was behind, strapped the horse, to drive him out. When the party got near the door, the defendant asked to see Captain Cloud. Hawkins then stepped to the door leading up stairs, leaving the witness standing talking to the defendant. About that time, Henderson stepped in and said: "Buck, I will attend to him." Witness supposed that Henderson and the defendant were acquaintances, and relinquished the horse. They got the horse on the cistern, when Hawkins told Henderson to back the horse off the cistern, while he went up stairs for Captain Cloud. Henderson backed the horse from the cistern against a stall. About this time, the defendant drew his pocket knife, and opened it with his left hand. Witness called out: "Look out, Joe, that young gentleman will cut you." Henderson was then pressing the horse back against the stall. The defendant having on a spur, spurred his horse forward, and struck three times at Henderson with his knife, striking the horse's neck the first and second blows, and Henderson in the left temple at the third blow. He then rode out of the stable, saying, as the witness understood him: "I have got one of the G—d d—d rascals, and if the rest follow, I will get them." He then rode to the front of the hotel and stopped, and Cloud came down just then, went to him and jerked him off his horse. By that time, the police came up, and the defendant was arrested.

Henderson's tone and language to the defendant throughout was kind and considerate. He asked the defendant in a kind manner to dismount and let him put his horse up, and promised

to attend to the animal properly.   The witness heard nothing that happened in the back yard, except Dutch John calling for police, and saw nothing but the defendant riding after John. The defendant's horse was a somewhat fiery animal, but did not seem extraordinarily excited.   The witness did not notice that the defendant wore a spur until he commenced spurring his animal when he was being backed.   He saw the defendant cut Henderson in the temple.   The knife he used was an ordinary pocket knife, very similar to that of the witness, which the witness here exhibited.   Witness first saw the knife when he called out to Henderson to look out.   The defendant was cursing at the time.   Witness did not see the knife after it was taken from the defendant's person.   The defendant struck Henderson quite a heavy blow, and Henderson fell very much like one stone dead.   Three hours afterward, when the witness next saw Henderson, he looked very much like a dead man.   His face was bloody and he was unconscious.   The wound in the temple was about as long as the width of the knife.   Witness saw Henderson several times afterwards, and attended him off and on for a couple of days.   He remained in the same comatose state during all the time that witness saw him.   Witness did not see him after he was taken to the hospital.   Witness identified the defendant as the man who cut Henderson.   He had never seen Henderson since he was taken from the stable, but knows that Henderson is supposed to be dead.

As was the case with the previous and all subsequent witnesses, the cross-examination of this witness was very searching. He stated that at the time of this homicide he was employed by Cloud at the stable, and intended to proceed on his way to Falls county the next day, the twentieth of the month, but was detained as a witness under bond, and consequently took service in the stable.   His connection with the parties to this difficulty was the result of pure accident.   He had been assisting a young man named Boukman to feed some horses, and as Boukman was busy when the defendant came into the stable, he volunteered to take defendant's horse.   The defendant had no weapon in his hand when he followed Dutch John into the stable from the yard.   He, defendant, had stopped before witness caught hold of his horse. Hawkins at no time told the witness to lead the horse out, nor did Hawkins lead the horse himself.   The witness himself led the horse, and Hawkins slapped him behind.   According to the witness's recollection, when the defendant came into the stable

from the yard and stopped, he asked the witness if he, witness, belonged to the stable, and said that he would go anywhere with witness. To this the witness replied: "Partner, you had better get out before you get into trouble." At that time Hawkins was standing either in the office door, or in the hallway leading up stairs. Witness led the horse to a point near the stable door, and the defendant said that he wanted to see Captain Cloud. Hawkins had not then gone after Captain Cloud, and the witness told him, Hawkins, to go. Witness at that time had the rein himself. Henderson at this moment walked in and said that he would take the horse, and witness released him. The horse was standing still when the witness released him, and when Henderson took him he was standing with his hind feet on the cistern.

When Henderson came in the witness thought he was drinking, and two hours afterwards could plainly smell liquor on his breath. Henderson backed the defendant's horse very roughly, calling "Whoa! whoa!" The witness thought that Hawkins told Henderson to back the horse, but the horse could have been just as easily led off the cistern. Morgan, the defendant, got out his knife at the point where the witness left the horse. When Henderson commenced backing the horse, the defendant told him two or three times to release his horse, and evidently meant what he said. The defendant took some apples out of his pocket at the time that he drew the knife. The apples fell to the ground, and were placed by some one on the scales. The deceased fell very heavily after he was struck. Witness did not know who got to Henderson first. He did not think that the horse struck Henderson's body in passing.

City Policeman A. J. Thorp testified that he was at the police station on the night of January 19, 1884, when a telephone message calling for police was received from Cloud's stable. Witness and Tom Johnson went immediately to the stable, where they found Hawkins in the office. Hawkins said: "I want you to arrest that man out there. Here is the man he has killed." Witness went to the defendant outside of the stable, and put his pistol to his breast, and Cloud pulled him, defendant, off his horse. Cloud said: "Look out; he will kill you." The defendant was then standing near the sidewalk in front of the stable hall door. Defendant was boisterous, and said: "Look out, G—d d—n you, I will kill you." Cloud and several parties witness did not know were standing around. Witness took a knife,

the blade of which was bloody, from the defendant. The knife exhibited was similar in every respect to that knife. Defendant had no other weapon when arrested. He was quite drunk.

Doctor M. A. Taylor was the next witness for the State. He testified that Doctors Cummings and Stalnaker called him in attendance upon the man Henderson at Cloud's stable, two days after his injury. Witness was called to assist at trephining the deceased's head. The physicians named, with the witness, met at Cloud's stable about three o'clock p. m., on January 20, 1883. They found Henderson in a comatose state, and upon examination arrived at the conclusion that his brain was injured, and from what they could gather from persons about the stable they supposed the injury to be the result of a violent fall. The witness's impression, without making an examination, was that Henderson was suffering from concussion, the result of a fall backwards, and it was thought that a fracture was discovered on the back part of the head. The physicians present proceeded to make a trephine of the head, but found no fracture. They had made a mistake, supposing that a congenital defect or malformation of the skull was a fracture. Some relief resulted from the trephining, the witness was told, but he did not see it himself. Coma results from injury to the brain. In some cases—of slight concussion—the patient laboring under coma can be aroused and enabled to respond to questions intelligently. In severe cases the patient cannot be aroused. This was the condition of Henderson when the witness saw him, but the witness was informed that he aroused and spoke once after the trephining operation. The witness found and left the patient in the comatose state. No examination of the temple wound was made in the presence of the witness. The witness proposed an examination of it, but the other physicians demurred, fearing to injure it.

The witness was present at the autopsy at the city hospital, some six or seven days after the trephining operation had been performed at the stable. There were present at that autopsy Doctors Given, Gasser, Johnson, Cummings, Wooten and the witness. The object of the autopsy was to discover the cause of Henderson's death. In the opinion of the witness, death was the result of the thrust of the knife into the brain. The knife penetrated the brain at a point on the level, and nearly, perhaps an inch, in advance of the ear, directly in, and probably upward, and may be a little backward, not exactly on a true line, and the measure was between two and three inches. The in-

cision was about an inch laterally. Such wounds are nearly al-
ways fatal. The witness saw such a knife on the examining
trial as that exhibited to him now. The point of this knife is
sharp, and the edge is turned as if it had passed over some re-
sisting surface. The brain near the wounded temple was in-
flamed to some extent along the arachnoid spaces. The places
trephined were also examined at the autopsy. It was the recol-
lection of the witness that the surgeons present concurred that
the cause of the death of Henderson was the wound in the tem-
ple. Trephine is often resorted to in cases of concussion of the
brain, and is often beneficial. Witness knew of cases cured
by trephining. Depression of the bone is the result of concus-
sion, and trephining is a process to remove the depression, and
in some cases is the only process available.

Cross-examined, the witness stated that injury to the cere-
brum, or upper brain, is not so dangerous as an injury to the
cerebellum, or lower brain. The dura mater is the brain cover-
ing that lines the inner part of the skull. The brain is of two
colors, white and gray matter. The knife in this instance en-
tered the left lobe of the cerebellum, slightly upward and back-
ward from a true line. The entry of a knife or pistol ball into
the cerebrum is not always fatal. In the experience of the wit-
ness as a surgeon, he had never known of the recovery of a pa-
tient whose brain, at the back part of the head, was touched
through the dura mater and the pia mater. According to the
recollection of the witness, there was a concurrence of opinion
among the physicians present at the autopsy as to which part of
the brain was penetrated by the knife, and that part, according
to his recollection, was the cerebellum. The brain was before
the physicians, and the nature of its injury was discussed. The
witness was not one of the operators at the autopsy, and did not
know that there was a wall of healthy brain matter between the
track of the wound and the cerebellum. Witness was present
when the discs were taken from the skull at the back of the
head. Doctor Cummings, who operated at that time, was the
only physician present besides the witness. Witness at that
time made only a casual external examination of the head, but
thought he discovered a fracture with his fingers.

The witness gave a technical description of the different parts
of the brain and skull, and said that, believing they had found
a fracture, Doctor Cummings performed a trephine operation,
which failed to disclose a fracture. Thinking they had mis-

taken the location of the fracture, the skull was trephined the second time with like result. The witness took no part in the operation; that is, he did not manipulate the instrument at all. After the second disc was removed without exposing a fracture, the witness was unwilling to experiment further with the trephine. It was developed on the autopsy that the theory of a fracture was a mistake. When the two trephine operations failed to disclose a fracture, the witness and Doctor Cummings became satisfied that the basis of the operation was a mistake. The witness thought at the beginning of the operation that the wound in the temple should have been examined. Witness knew of no surgeon examining the wound in the temple. No bruised condition of the scalp was found before the trephining operations were performed. The process of trephining over the cerebellum is dangerous though admissible practice. It is dangerous, even though it does not wound the membranes of the brain, inasmuch as it may produce inflammation. Wounding of the dura mater increases the danger; wounding of the arachnoid makes the danger greater, and the wounding of the pia mater still greater. In performing the trephining operation in this case, the dura mater was very slightly cut—not cut through. There was a very little blood found in that locality. The difference between the brain at that time and at the autopsy was very little. Very little, if any, blood was drawn by the trephining operation. Where the skull is cut through, and both the dura mater and pia mater are cut through, or punctured so that blood will ooze brainward in such quantities that it could be removed with the finger, the patient will die. There have been cases of recovery from wounds in the cerebrum. Ordinarily, with any degree of care in the attending physician, the piece of fractured skull the witness saw in the temple bone at the autopsy would have been discovered.

In answer to the question if the failure to discover the fracture of the temple bone was not the result of gross negligence, the witness said that he would so consider it in the physician first called, but there was an apology for a subsequent physician. If witness had been called to examine the wound in the temple—the only apparent wound—he would have examined it. It ought to have been examined. The witness had no conversation with Doctor Wooten before the autopsy. In his former examination the witness may have stated that he thought the fracture followed a certain course and could not be defined. The trephin-

ing operation did not produce the death of Henderson. More time would have been required for that operation to have resulted in death. Inflammation had not progressed to a fatal extent. Witness noticed the condition of the brain where it was penetrated by the knife. It showed some trouble, and there was more or less extravasation of blood. Witness did not take the dura mater in his hand at the autopsy. Witness thought some one of the doctors present took the scalpel and flirted blood from the brain in very small quantity.

A. J. Daugherty testified, for the State, in substance, that he was at Cloud's stable at the time of the tragedy. He was standing in the office when the defendant rode into the stable, talking boisterously, and denouncing some one, whom he said wanted to visit his sister, but who was totally unworthy. It was the impression of the witness that the defendant was talking to Buck Watkins about some body else. Defendant and Watkins, when witness first saw them, were standing near the door which led into the yard. Watkins seemed to be trying to get defendant to go out, and got him to a point near the front door, when Henderson came up and placed one hand on the horse's neck and the other on defendant's thigh. Defendant had some apples in his hands, which he offered Henderson, but, Henderson refusing them, he either threw or dropped them on the ground. Hawkins picked the apples up and offered them to the defendant, who rejecting them, Hawkins placed them on a chest that stood near. Henderson took hold of the defendant's horse and tried to lead him out. Witness, seeing that the defendant was under the influence of whisky, and not caring to see too much of what might happen, walked off. At the door of the stable he turned and looked back and saw Henderson lying on his back. The defendant yelled once and rode out of the stable. When he got outside he turned his horse about half way round and said: "Here I am. If any of the rest of you want me, come out here and I will get some more of you." This was followed presently by the breaking of the window, which witness and others at the time took to be shooting. The defendant was cursing all the time, but did not seem to be cursing Henderson. On the contrary, witness, as long as he saw defendant and Henderson together, thought they were on good terms.

The testimony of Martin Langford, the next witness for the State, was, in substance, that he was present at Cloud's stable at the time of the cutting, but could not identify the man who

did it. He had never seen him before. Witness saw a young man in the stable on a horse, cursing violently. The man on horseback passed through the stable into the wagon yard, and got into a dispute with the yard man. Presently the yard man came into the stable, followed by the man on horseback. Buck Watkins met the man near the stable door, took hold of his horse, and asked if he wanted his horse put up. The man said that he did not. Watkins then told him that he must either put up his horse or go out. Hawkins then whipped the horse and tried to drive him out, Watkins at the same time trying to lead the horse. The man then said that he wanted to see Captain Cloud. Hawkins went off to call Cloud, and about this time Henderson came up and said to Watkins: "Turn this fellow over to me; I will take care of him." Watkins released the horse, and Henderson asked the man if he did not want to put his horse up. The man said that he had no money. Henderson replied that it made no difference. But the man still refused. Henderson then seemed to try to get the man out by pulling at his horse. The horse then backed out of witness's sight. He came forward presently, and the witness saw the man cutting at Henderson. He saw the knife blade flash in the gas light. The man said that he would shoot if Henderson did not release his horse, but the witness saw no pistol. When hit, Henderson let go the rein and fell. The man rode out of the stable, saying: "I have got one of you, and if there is any more of you, come out."

The cross-examination of this witness was a reiteration of his testimony in chief, with somewhat more of detail, but developed no variance. He stated that he was certain that it was Watkins who attempted to lead the horse, and Hawkins who struck the horse.

Doctor J. B. Cummings was the next witness for the State. He testified, in substance, that he was called to attend Henderson several hours after the wound was dressed. Witness did not see Doctor Stalnaker on that night, but the latter was present next day. When witness first saw the wounded man there was blood on his beard and about the bandage Doctor Stalnaker had put on his head, which was much soiled. Witness tried to wash the blood off, clipped the whiskers, and ordered cold cloths put on the wound. This first visit was at night, at a time when it is very difficult to take up the small arteries in the temple, and as Doctor Stalnaker had already examined the wound, and as

the patient was in a comatose state, the witness did nothing more then.   Not liking to interfere, the witness did not go to see the patient next day, until he was sent for at twelve o'clock. Henderson had a violent convulsion as witness entered the door, which he relieved by a hyperdermic injection of morphia.   Witness also observed paralysis.  It appeared to the witness that the wound in the temple was too low to involve the brain.   Witness was told the man fell heavily, and observed the hard nature of the ground.   He then examined the back part of the head. Witness saw Henderson often after that up to his death.   He remained in the comatose state, but was several times partially aroused, after the trephining operation.   He could take a little water, swallow, and partially understand, and seemed at times to respond to impressions made on him.

The witness was present at the autopsy, and had occasion to examine the temple wound at that time, and found upon that examination that the knife had penetrated a very thin part of the temple bone and passed into the brain about two and three-fourths inches, describing the course stated by Doctor Taylor. Witness noticed extravasation of blood about the ventricle of the brain, and observed that supperation had taken place along the track of the wound.   The effect of this condition was to congest the entire brain, produce inflammation and certain death.   The coverings of the brain are very vascular, and any wound to them may affect the entire brain.   Witness saw the knife exhibited, after the death of Henderson.   The blade is bloody, and the edge is turned in a manner that might have been done by striking a bone.   The point of the blade of the knife penetrated nearly to the lateral ventricle, involving it in the congestion.   The effect of such congestion is almost invariably to produce death within eight days.   This wound, in the opinion of the witness, penetrated only the cerebrum.   The congestion almost entirely resulted from the temple wound—very little from the trephining operation.

Cross-examined, the witness said he was called to Henderson about midnight on the night he was cut.   Witness was city and county physician.   He made no further examination of the temple wound that night than to remove the first and place a second bandage on it, and order cold applications.   He did not insert his finger into the wound.   Witness went back at midday next day and found the patient in convulsions.   He sent for Doctor Stalnaker, who first attended him.   He and Doctor Stalnaker

M 1

examined the back of the head, but not the temple wound. Wit-
ness thought he found injuries in the back of the head. The
conclusion was reached that this supposed injury in the back of
the head was the cause of the patient's condition, and that the
trephining operation might give relief. Witness called Doctor
Taylor to assist in the trephining operation at two o'clock, and
sent for Doctor Stalnaker, but did not secure him. Witness thought
Mr. Sprinkle was present during the operation. Mr. Cloud may
have passed in and out during that time. No bruise of any kind
was found on the scalp. The scalp was smooth and natural, a
condition, however, not incompatible with the theory of a seri-
ous bone injury. This witness described the trephine operations
substantially as Doctor Taylor did, and said that in locating a
fracture at the two places where they took out discs of the skull
they were mistaken. The witness then came to the conclusion that
the fracture was too extensive to interfere with further, and held
to this opinion, in which he believed Doctor Taylor concurred,
notwithstanding the trephining process disclosed no fracture.
The witness entertained this opinion because it seemed to him
that the entire section of the skull moved under pressure of the
fingers. It was his recollection that the elevator was used in
trying to determine whether or not the skull moved. The scalp
was sewed up after the trephining operation was performed.

The witness at no time examined the temple wound. He did
not in fact think at that time that that wound accounted for the
patient's condition. The trephining operation was performed
on January 20, 1883; the patient died on January 25, and the
autopsy was held on January 26, the witness, and Doctors Tay-
lor, Given, Gasser, Wooten and Johnson, and Messrs. von Ro-
senberg, the justice of the peace, and S. G. Sneed, being present.
The witness made the usual incision, stating to the parties pres-
ent, when he first took the knife to perform the operation: "I
will now show you where the real difficulty is," still adhering to
his former impression. He did not think he said: "I will
show you that there is no fracture in the temple," although
such was his impression. When witness saw the hole in the
temple he first discovered that there was a fracture there, and
turning to Doctor Taylor, he said: "Doctor, we have made a
mistake." It was then disclosed that a congenital deformity had
misled the witness and Doctor Taylor. After this the witness
removed the brain and it was examined; the knife was found to
have penetrated the cerebrum two and three-quarters inches,

and approached one of the ventricles very near, but did not cut it. It was the opinion of the witness that that wound (in the temple) congested the entire brain. In performing the trephine operation, the witness wounded a membrane just a little at one point. He noticed that wound at the time of the operation and again at the autopsy. There was very slightly more congestion at that part of the brain than elsewhere. The witness did not think there was any extravasated blood under the dura mater nor under the pia mater. It was his impression that the blood was confined to the vessels of the pia mater.

The witness thought he saw some one of the physicians try to throw blood from that point, but he threw out very little. The presence of blood at that point was not dependent on a wound there. It might have been forced there by gravitation. That physician said that that blood was freed from the blood vessels, but the witness had his own opinion about that. " I saw him interfere with the general arrangements of the parts there, and pick out some of that vascular texture in the little depressions of the brain, but he had to go between them. All over the brain that redness existed, and you could have picked it out at any part of the brain in the same manner, but I do not think the vessel was broken before he took the knife and picked it out. The blood, if coagulated, would not flow. This was not more coagulated than any other blood vessel." To the question, " Doctor, do I understand you to say that Doctor Wooten broke a blood vessel, and held up blood from it?" the witness replied: " I say there was net work, and he took up net work, including this blood." The defense asked: " Is it not true that Doctors Wooten, Given and Johnson found blood in that part." Answer: " There was general congestion, and it was also upon the opposite side. They have their opinion, and I have mine." The witness had no recollection of flipping out blood himself that had been freed from the vessels and coagulated at that point, nor did he see it done by any one else, except in the manner described. The trephining process produced no abscess, nor any evidence of inflammation that would show a serious result. The autopsy disclosed that the fatal wound was in the temple. It showed that no serious consequence followed the trephining operation that could result in death or fatal injury.

Doctor J. J. Gasser testified, for the State, that he was present at the autopsy by invitation of Doctor Cummings. He witnessed the operation and formed a satisfactory conclusion as to the

cause of death.   Death was the result of a wound extending through the left temple into the brain about two and a half inches.   Such a wound would produce general paralysis.   After the brain was taken from the skull Doctor Wooten cut off the left side of the brain, slice after slice, until he came to the wound.   The color there was a dark red, indicating gangrene. The brain matter at a distance from that point appeared normal. The dura mater, etc., showed congestion.   It showed injury in the back of the head from the trephining operation.   This was near the occipital suture.   The wound went near to the ventricle, and the discoloration reached the centre of the brain.   A piece of skull was loose in the hole made by the temple wound. In the opinion of the witness, the wound in the temple killed Henderson.

On cross-examination, the witness gave a lengthy technical description of the various parts of the brain, and spoke of the various parts with regard to their comparative sensitiveness to injury.   He reiterated that, in his opinion, the death of the wounded man resulted from the wound in the temple.   There was a little perforation of the dura mater, and it showed a little redness, covering a space of little over half an inch, in which the redness was a little more obvious than elsewhere.   Witness could not see that the injury occassioned by the trephining operation was sufficient to account for the condition of the brain.   He could not say that the injury in the back of the head, in connection with the wound in the temple, contributed to hastening Henderson's death.   Witness saw no coagulated blood, nor did he see any clotted blood thrown out.   A wound in the cerebrum is not necessarily fatal.   The trephine in this case was on the posterior lobe of the cerebrum, extending towards the cerebellum. The State closed.

S. G. Sneed, the uncle of the defendant, was his first witness. He testified that he was a lawyer by profession, but followed the life of a teacher and student.   He kept himself well posted in matters of science by reading, and esteemed himself well versed in true science.   He was present at the autopsy, at which were also present Doctors Taylor, Cummings, Gasser, Given, Wooten and Johnson, and one or two attendants.   Doctor Wooten asked the question whether or not Doctors Taylor and Cummings had removed all the bone.   It was replied to in the negative, with the statement that the fracture, after trephining, was found, by using the elevator, to be too extensive.   Witness had gone for

the purpose of seeing exactly the true condition of the brain, and accordingly placed himself on the table on which the body lay. Doctor Cummings operated, saying, as he exposed the two holes: "Here is the injury, but I will now show you the other wound." As soon as the scalp was turned down enough to expose the wound in the temple, it became apparent that the skull had been broken through, and a piece of the bone was detached and lying in the wound. Thereupon Doctor Cummings turned to Doctor Taylor and said: "Doctor, we have made a mistake;" to which Doctor Taylor assented. Doctor Cummings then sawed off the skull and took out the brain, and the physicians proceeded to examine it. The wound measured two and a half or two and three-quarter inches. The course of the wound was laid open and found to be highly inflamed and decomposed.

The membranes under the point trephined were cut through, and the surface next to the wound was reddened to the extent of two and a half or three inches. The wounded point was under the base of the skull, and the witness thought that Doctor Cummings took the handle of the knife and removed some clots of blood from the convolutions of the brain at that point. The witness did the same thing, and was of impression that others did. It seemed to be agreed that there was no injury of any kind to the back of the skull, except that produced by the trephining. The membranes were torn away, exposing the brain itself. There was one or more inches of perfectly healthy brain matter between the front brain and the cerebellum. The blood witness took out and saw taken out was taken from under the pia mater, and from the convolutions of the brain. There was about two and a half or three inches of inflammation around the wound in the back part of the head. There was a free space between the two wounds, in which there was no inflammation. There was considerable space between the temple wound and that in the back of the brain, in which there was no blood in the convolutions. Between the cerebellum and the place where the blood had coagulated, there was a clear space of two and a half or three inches. The blood was not in a very strong coagulum, but flipped out easily. There was no connection between the base wound in the cerebellum and the temple wound. The trephine wound struck just above the cerebellum. The coagulum and inflammation were co-extensive, and extended from the wound in the back of the head over part of the cerebellum.

Cross-examined by the State, the witness said that the three

membranes of the brain were penetrated by the temple wound. The track of the wound was discolored, the reddish color being intense in the center, diminishing as it left the track of the wound. In the anterior it was red, and gradually ran itself out until it disappeared. It was distinctly understood between the physicians present that the knife wound did not reach the cerebellum.

J. P. Sprinkle was the next witness for the defense. He testified that he was present when the trephining operation was performed by Doctors Cummings and Taylor, and described the manner of operation. The witness noticed the scalp before the discs were taken out. He saw no bruises of any kind on the back part of the head. He noticed the skull, and saw no fracture of any kind. It looked perfectly sound and healthy. He saw the brain after the pieces of skull were lifted out by the use of the elevator in the hands of the doctors. It looked perfectly natural to the witness. The holes described were cut into the back part of the head.

I. S. Albin was the next witness for the defense. He testified that he was in Cloud's stable on the night that Henderson was thrown down. Witness first saw the defendant and Watkins together, near the door leading from the stable into the wagon yard. They were going toward the front door, quietly, Watkins leading the defendant's horse. Watkins said something to the defendant about going out, and defendant replied that he would go anywhere with Watkins. Shortly, some one went to where defendant and Watkins were. In a few minutes more, Henderson came in through the east door, caught defendant's horse by the bridle, and said: "Hallao, pard." Some conversation of a general character passed between them, but nothing indicating ill feeling. Defendant presently pulled some apples from his pocket and dropped them. He asked Henderson if he belonged to the stable. Henderson replied that he was at work there. Defendant replied: "Then stand over by that gentleman there," pointing toward Watkins. Henderson then remarked: "You don't call that man a gentleman, do you?" Defendant replied: "Yes, I call him a gentleman." Henderson, with an oath, said: "He's the biggest rascal in town." The defendant then told Henderson to release his horse. Henderson jerked the horse violently, calling out, roughly: "Whoa! whoa!" He pushed the horse back violently, and the defendant told him twice, perhaps three times, to release the horse. Henderson

pushed the horse very roughly some distance, partially into a stall, when the horse came near falling down. The horse plunged forward, and the witness saw Henderson fall. Witness thought the horse knocked him down.

Witness was the first one to reach Henderson, and, unaided, raised him to a sitting posture. Witness called for help but received none. Hawkins did not aid in raising Henderson, or in supporting him in a sitting posture. Defendant rode out the east door when Henderson fell, saying: "I told you to turn my horse loose, and you would not do it." The horse's feet were not on the cistern nor were his hind parts quartered in that direction.

Cross-examined, the witness said that he saw no knife in the defendant's hand. He saw the defendant strike at Henderson three times, but he was of impression that Henderson was knocked down by coming in contact with the horse. The first blood the witness saw was under Henderson's head, on the ground. He saw no wound until Henderson had been taken into the office. He then saw what he took to be a knife wound in the temple. Shortly before the cutting the witness saw Hawkins in the stable, but did not hear him tell Henderson to hold defendant's horse until he went for Cloud, nor did he hear him tell Henderson not to let the horse get on the cistern. Henderson was trying to hold the horse, and defendant was pulling back. Henderson was pushing the horse roughly into the stall, and the horse was bounding forward when the defendant struck. Witness had no idea at the time that the men were in an angry struggle. Witness had talked to Cloud in a general way, with people around, about the occurrence.

Joseph Heffington was the next witness for the defense. His testimony was substantially the same as that given by the witness Albin on his examination in chief. He thought that when the horse bounded forwards, at the time that the defendant struck at Henderson, Henderson struck back. His impression was that the struggle was a good natured one, and when Henderson fell he thought the horse knocked him down. Going out the defendant said: "I told you to let my horse loose, and you would not do it. If any of you want me, here I am." The witness did not see Hawkins have hold of the defendant's horse at any time that night. He did not hear Hawkins tell Henderson not to let defendant's horse get on the cistern. He saw nothing in the defendant's hand when he was striking at Henderson.

Doctor T. D. Wooten was the next witness for the defense. He testified that he was present at the autopsy. He saw a short incision in the left temple, and in the rear, a little to the left of the median line, found another incision, where the skull had been trephined. The cranium was then opened by Dr. Cummings, and the condition of the skull was exposed. Examination disclosed that the skull had been penetrated through the left temple, making a fracture one inch across the external ear. Two small discs had been trephined out of the back part of the skull. The brain was then exposed by sawing off the skull. The instrument that made the temple wound penetrated the brain about two and a half or three inches in an inward, backward, and slightly upward direction. Along the path of the temple wound, suppuration had intervened, and there was some matter in the back of the head under the trephine. Some blood had extravasated under the membranes. The instrument passed in the neighborhood of one of the lateral sinuses, but the cavity was not involved. There was neither inflammation nor excessive serum in the two cavities of the brain.

The triangular opening at the temple was made by driving in a piece of the skull. It was a triangular piece of bone, about an inch from the base to the apex of the triangle, and was projecting to a certain extent into the brain matter. There was some evidence of extravasated blood at the temple fracture. Under and in the vicinity of the trephine there was extravasated blood beneath the pia mater, on the surface of the brain matter, and there was some extravasation between the pia mater and the arachnoid. Extravasation is where a vessel has been broken and the blood is flowing out. In this instance it was extravasation into the brain. The three brain coverings, the dura mater, the arachnoid, and the pia mater, were cut by the trephine. There was congestion along the track of the temple wound. There was inflammation about the wound in the back of the head, and it extended forward. The inflammations from the two wounds, though extending toward each other, did not meet. Between the two was a space of brain in a normal condition. At the temple wound, a piece of skull was projecting into the brainy substance, point foremost, which was very injurious, being calculated to produce inflammation. A wound in the cerebrum is not necessarily fatal.

From his examination of the temple wound, the witness judged that if the fragment of skull had been removed, and the patient

subsequently been properly treated, he might have had a chance to recover. That bone should have been removed. The trephine wound had not progressed far enough to destroy life. The injury in the temple had. There were evidences of progress of inflammation from the wound in the back part of the head, but the witness could not say what would have been the eventual result of the trephining operation. The inflammation from the temple injury did not extend to the cerebellum. The wound behind was in the superficial covering of the brain. Witness had frequently performed the trephine operation. Trephining is regarded in surgery as a dangerous operation, but not extremely so, when carefully performed. It is resorted to when the skull is broken and depressed, and it becomes necessary to remove the depression. Inasmuch as the trephining operation in this case must necessarily have weakened the patient's powers of resistance, the witness was satisfied that to that entent it hastened the man's death. The condition of the brain in the rear could not have resulted from the temple wound; it was entirely unaffected by the temple wound. The conditions of the brain, front and back, were entirely different and distinct, and they were separated by a space of unaffected brain matter. The cerebellum is more sensitive to injury than the cerebrum. There is much more danger in trephining over the base of the brain than over the anterior portions. The witness had never seen a fracture of the prominent protuberant part of the rear skull that was not produced by ball, bullet or shot.

A force applied at the back of the head will frequently fracture the skull in front. The witness had never had occasion to trephine the back part of a skull, and had never seen that part of a skull trephined. A grape shot or pistol shot, or kindred injury, might create an occasion for trephining the back part of a skull, but perhaps no other kind of injury to that part would. The witness thought it impossible for a fracture of the back part of a man's skull to exist without leaving some external evidence on the scalp. Doctor Cummings said, at first, at the autopsy, that it was hardly worth while to remove the scalp, as the wound in front was merely superficial. Witness advised the removal of the scalp before examining the rear wound, and Doctor Cummings did so. The removal of the fractured bone in the temple would have imparted additional chance of recovery to the patient. It would not have been necessary to trephine the temple, The necessity for trephining does not exist when the surgeon can

get under the bone and remove it. In this instance the fractured bone could have been removed. While sitting on the hospital gallery, Doctor Taylor remarked that this skull was fractured in the rear, and that the skull had been trephined in that section, but that the fracture was so extensive it could not be raised; that in boring through the skull the fracture was found to be very large, so large that it would expose a large surface of the brain, and the trephining was abandoned. There was no abnormal condition of the brain behind except that explained by the trephining operations. There was a little larger protuberance of the skull than is usual, but not enough to be decided. It is rarely that a head is found perfectly symmetrical in that section.

Cross-examined, the witness stated that inflammation from the trephining operation had not proceeded very far. The wound in the temple caused the death of Henderson.

Doctor James G. Given was the next witness for the defense. He was present at the autopsy, and his statement was not immaterially variant from that of Doctor Wooten, though he went somewhat more into detail. Doctor Cummings appeared considerably surprised when the incision in the temple was discovered. The broken bone at the temple projected into the brain, the other end remaining lightly attached to the skull. This wound passed near but did not injure the ventricle. It was some distance, two and a half or three inches, from the cerebellum, in the anterior lobe of the cerebrum. On the back of the head were found two holes, or discs, made by the trephine, around which was considerable inflammation, and blood poured out. One of the teeth of the instrument had cut the superior longitudinal sinus. The trephine passed through the three membranes of the brain and touched the brain itself. Extravasation was found in the convolutions of the brain in the region of the trephine operation. The space radiating an inch and a half from this point of injury was bloody, the result of the inflammation from the trephine, and some blood was thrown out. Coagulated and clotted blood was found on the brain, underneath the pia mater. The trephine wound in the back of the head was very serious in its nature; its effect was to materially damage the patient's vitality. It had a very injurious effect on the patient, owing to the primary wound, and, in the opinion of the witness, it shortened the patient's life. The witness never but

once performed the trephine operation. He had never before known it to be attempted on the back of the head.

A trephine near the base of the skull is more dangerous than one further removed from the base. Injuries near the base of the brain are usually fatal, and a fracture of the base is fatal. The nearer to the base the more dangerous the wound. By the "base" is meant the front of the cerebellum. The knife or temple wound entered about two and a half inches from the cerebellum. The wound in the back of the head was about the line of the cerebellum. From this rear wound the lower portion of the cerebrum and the upper part of the cerebellum were inflamed, and the witness was of opinion that this inflammation of the cerebellum depleted the patient's chance of recovery. The temple wound in this case was, in the opinion of the witness, the mortal wound.

Doctor R. J. Johnson testified, for the defense, that he was present at the autopsy, and examined the patient's skull, etc. There were two trephine discs on the back part of the skull, and under these discs the three membranes had been cut by some instrument. Clotted blood extended around the openings as a centre for about an inch on every side. Witness threw some of this blood out with his fingers. The extravasation had sufficiently advanced to be flipped out. After getting under the pia mater it was not necessary to break anything in order to get the blood out. The blood was extravasated, was on the brain, and was not vein blood. Witness was present at the conversation between Doctor Wooten and Doctor Taylor on the gallery before the *post mortem* was commenced. Witness did not remember all of that conversation. He did remember Doctor Taylor saying, in reply to an inquiry of Doctor Wooten, that the autopsy would disclose a fracture in the back of the head, and that the said fracture was too large to be covered by trephining. He heard Doctor Cummings say, when he took up the knife to commence operating: "We will now see that the injury is in the rear of the head, and that there is a fracture there."

It was admitted that the horse ridden by the defendant on the night of the tragedy was a horse known as "Bill," which had belonged to the late Captain Thomas E. Sneed, senior.

Captain T. E. Sneed was the next witness for the defense. He testified that he knew the horse Bill, ridden by the defendant at the time of the cutting. That horse belonged to the estate of the witness's deceased father. He was a horse of high metal, and was very sensitive about his hind quarters; so much so that

he would not endure harness or breeching. Witness remembered the witness Hawkins who testified on this and the former trial of this case. He remembered his testimony on the former trial. He took notes of his testimony then, and has the notes yet. With reference to the manner in which the defendant's horse was conducted from the rear to the front of the stable, Hawkins, on the former trial, testified, substantially, that he ordered a man whom he called the "Dutchman," the yard man, back into the yard, and directed Buck Watkins to lead the horse out of the stable; that Buck Watkins took hold of the bridle and he, Hawkins, went behind the horse and slapped him up, to make him go on toward the door, and the horse was thus carried to a point near the door.

Doctor Stalnaker, now dead, of whose testimony on the former trial of this case the witness took notes, testified on that trial that, being sent for to attend Mr. Henderson on the night of his injury, he found Henderson in bed in the office at Cloud's stable; that he found an incised wound in the temple somewhere in the neighborhood of an inch in length; that it was bleeding, and he inserted his finger into the wound, not so much for the purpose of examining the injury as stopping the hemorrhage, and for the purpose of compressing any vessel that might have been cut, and by that means stop the hemorrhage; that when he inserted his finger he felt some spicular, but made no further examination of the wound, and pressed the lips of the wound together without using adhesive plaster, having none with him; that he then put a compress around the bandage to hold it firmly   He further testified that he was called for next day, but learning that Mr. Henderson was poor and unable to pay for medical services, he suggested that Doctor Cummings, the city physician, who was charged with the care of such cases, should be called in, and that he saw the patient no more after he turned the case over to Doctor Cummings.

Cross-examined, the witness stated that Doctor Stalnaker testified that, when he was called that night, he was informed that Henderson had struck his head violently on the hard surface of the stable floor, and that he attributed the condition of the man to the concussion produced by the fall. He testified that he called next day, but the witness did not remember what he testified in regard to Henderson's condition at that time.

S. O. Cloud testified, for the State, in rebuttal, that he saw the witness Albin for the first time on the night of the cutting,

Albin was at the stable at the time it occurred, and was the first man to speak to the witness about the difficulty after it was over. A great many parties were in the stable at the time. Albin gave pretty much the same account of the affair as was given by the witness Hawkins. He told the witness that the defendant said he had killed one of the d——d rascals, and that he would kill another one.

Cross-examined, the witness said he was at supper when the cutting occurred. Several parties talked to witness about the matter, and he thought they all told pretty much the same story. Witness saw the defendant trying to ride into the house, and was quite angry. Witness had not, that he knew, met the man Albin until that evening. Three or four other parties whom witness did not know had stopped at the stable.

The original and amended motions for new trial presented the questions considered in the opinions.

*Walton & Hill* and *Sheeks & Sneed* filed able and exhaustive briefs and arguments for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. The appellant in this case was convicted of murder in the second degree. A reversal of the judgment is sought on three grounds:

1. Error in the admission of certain evidence.
2. Defects in the charge of the court in two particulars.
3. Error in refusing charges requested by the defendant.

First ground: The witness Cummings, M. D., stated that he believed that the wound in the temple, and not that inflicted by the trephining operation, killed the deceased. He was then asked by the State's counsel if this conclusion was concurred in by the other physicians present, viz: Taylor, Wooten, Given, Johnson and Gasser. To this question the defendant objected, because the desired evidence was hearsay. The objection was overruled, and the witness answered that the opinion which he had given as to the cause of the death was concurred in and agreed to by the other physicians before named at the time of the *post mortem* examination.

We are of the opinion that the objection of the defendant should have been sustained. This evidence was clearly hearsay, and not admissible. But, as all of these physicians were ex-

amined as witnesses, and testified that, in their opinion, the wound in the temple, and not the trephining operation, caused the death of the deceased, certainly no injury appears to have been done the defendant by its introduction.

Second: Error in the charge in the first particular, viz: that in the ninth subdivision of the charge implied malice is explained as follows: "Implied malice is an inference or conclusion of law upon certain facts found by the jury. Thus the law implies malice from the unlawful killing of a human being, unless the circumstances make it *evident* that the killing was either justifiable, or, if not justifiable, was so mitigated as to reduce the offense below murder in the second degree."

The proposition contained in this charge is simply this: That when an unlawful killing is shown, the homicide is presumed by law to be upon malice, and in order to meet and overcome this legal presumption, the evidence—circumstances—must make it *evident* that the killing was justifiable, or so mitigated as to reduce the offense below murder in the second degree. The appellant objected at the time to this charge. Is it obnoxious to the objection urged to it in the appellant's brief? Does this charge shift the burden of proof? We think not. Does it infringe the doctrine of reasonable doubt? We are of the opinion that it does, and this is so, and is susceptible of the clearest demonstration.

Let us illustrate: A is charged, and is on trial for the murder of B. The State proved that A unlawfully killed B, and here closed. A adduces evidence and circumstances tending to justify or reduce the homicide below murder. Must his justification be evident? Or must the evidence and circumstances render evident the fact that the homicide was not upon malice, but was manslaughter or negligent homicide? Suppose that neither justification, manslaughter, nor negligent homicide is by the evidence made evident; but suppose the evidence adduced by the State or the defendant which tends to support justification, manslaughter or negligent homicide is sufficient to raise a reasonable doubt of the existence of malice, sufficient to warrant the jury in calling in question this legal presumption. Should the jury find malice and convict of murder? Evidently they should not. A preponderance of evidence in support of circumstances which tend to justify or reduce is not required, the correct proposition being that the State must prove malice, and that if there be a reasonable doubt of its existence, either from

the evidence or from any evidence, whether adduced by the State or by the defendant, he cannot be legally convicted of homicide upon malice.

Let us view this subject in another light.    An indictment for murder charges at least three distinct offenses; while it charges others, three will suffice for the present purpose, to wit, murder in the first degree, murder in the second degree, and manslaughter.    Now, the defendant is notified and called upon to answer each of these offenses.    And the State, under these charges, can and must prove one of these charges, beyond a reasonable doubt, to be entitled to a conviction.    These charges, or one of them, viz, murder in the first degree, murder in the second degree, and manslaughter, though contained in the same indictment, and though the trial may be upon all at the same time, must be established by the same character of proof—proved in the same manner—as if the trial was upon an indictment which charged but one.    And in order to convict of the highest, viz, murder in the first degree, the burden is upon the State to show that the homicide was committed under such circumstances as to constitute murder of the first degree.    And so with murder of the second degree; proof must be made that the killing was upon malice, and this must be shown beyond a reasonable doubt.    Just what facts will make such proof we are not now discussing.

To entitle the State to a verdict of murder in the second degree, she must prove that the defendant took the life of the deceased, and that the homicide was prompted by a wicked and depraved heart, void of social duty and fatally bent on mischief, that is, by malice.    These facts are established by proof of the existence of facts and by proof of the absence of facts.

Again let us illustrate:    A is upon trial for the murder of B, The State finds that A shot and killed B.    This would be a very remarkable case if the evidence were to stop here—such a case as will never arise if prosecuted with the slightest attention, and hence we will not discuss such a case.    But suppose that a witness were to swear that he saw B, standing on the street, and that A drew his pistol, and while B was standing on the street, A shot and killed him; and here the evidence closed.    This being the case, all of the case, very evidently A would be guilty of homicide upon malice, for he who would shoot down a human being under these circumstances, certainly would be prompted by a wicked and depraved heart, a heart void of social duty and fatally bent upon mischief.    But suppose B had been breathing

out deadly threats against A, of which he had been informed, and that just before he shot, B did some act showing an intent to execute his threats? Here we find an issue for the jury, viz: was the homicide upon malice or in self-defense? and if there should be a reasonable doubt of the malice, A should be given the benefit of this doubt and acquitted of homicide upon malice. We could illustrate with reference to manslaughter and negligent homicide, in fact, to all offenses embraced in murder, but deem the above sufficient.

We are of the opinion that the charge was erroneous, and, as it was excepted to at the time, we are also of the opinion that it contained such error as requires the reversal of the judgment.

But it is urged that in *Sharp* v. *The State*, 6 Texas Court of Appeals, 650, this precise charge was, by the court, held sufficient. In this case it does not appear that the attention of this court was called to the word "evident." In regard to this charge the learned judge (Winkler) says that it sufficiently informed the jury as to what facts and circumstances would justify them in descending from the first degree and convicting of murder in the second degree, if, indeed, the defendant was entitled to a charge on that grade of offense under the proofs adduced. But if it was the intention of this court to hold that the word "evident" was properly used, and that in fact justification, or the reduction of the offense to manslaughter, etc., must be made evident by the evidence, then that case is overruled.

But again it is urged by the State that as the court charged the jury that if they had a reasonable doubt of the defendant's guilt of murder of the second degree they must acquit, that therefore the error above noticed was rendered harmless. These charges are in direct conflict, and as defendant objected at the time, and as we cannot say that the jury was not misled by the erroneous charge, we feel constrained to reverse the judgment.

The next ground of complaint to the charge is in reference to the twelfth and thirteenth subdivisions of the charge. On the nineteenth day of January, 1883, the deceased was stabbed with a pocket knife in the left temple. When struck with the knife the deceased fell to the ground, and, upon examination, was found in a comatose state, in which condition he remained up to his death, which was on the twenty-fifth day of January, 1883. On the twentieth day of January the surgeons performed the trephining operation, taking from the back part of the head two pieces of skull.

The autopsy disclosed that the knife had entered through the skull and penetrated the brain about two and a half inches, in an inward, backward and slightly upward direction. Along the track of this wound in the temple it was suppurated. A triangular piece of skull, size and shape about one inch from the base to the apex of the triangle, was driven into the brain. There is no reason for doubt that the wound inflicted in the temple by the defendant produced the death of the deceased; all of the surgeons agree to this. Two of the surgeons, however, on the twentieth of January, mistaking an irregularity, a congenital malformation of the skull, for a fracture, operated by trephining, and two pieces of skull were taken from the back part of the head. To the wound in the temple nothing whatever was done except to bandage and keep it cool, when by proper treatment the piece of bone could have been removed, and a chance given the deceased to recover. That there is evidence in this record tending strongly to show that there was gross negligence and manifestly improper treatment of the deceased cannot be denied and must be conceded.

Under the above facts—all of the facts relating to the different wounds, their character and the negligence and their improper treatment—what instructions should be given to the jury by the trial judge? The appellant complains of the charges of the court touching this matter. What, therefore, did his honor below charge?

"3. Homicide is the destruction of the life of a human being by the act, agency, procurement or culpable omission of another.

"4. The destruction of life must be complete by such act, agency, procurement or omission; but, although the injury which caused death might not under other circumstances have proved fatal, yet if such injury be the cause of death, without its appearing that there has been any gross neglect or manifestly improper treatment of the person injured, it is *homicide.*

"5. The neglect or improper treatment referred to has reference to the acts of some person other than he who inflicts the first injury, as the physician, nurse or other attendant."

"12. If the jury find from the testimony that the defendant, at the time and place as alleged in the indictment, with a knife did inflict the wound in the head of the said Joseph Henderson, as charged, and they further find from the testimony that there has been gross neglect or manifestly improper treatment of said

Henderson, by any one or more of the physicians attending him, between the infliction of the wound and his death, which improper treatment or neglect, if any, caused the death of said Henderson, then the jury cannot find the defendant guilty of taking the life of Henderson. And if the jury so find from the testimony, then they will find the defendant not guilty. If the wound (if shown by the testimony) inflicted by the defendant upon Henderson was not in itself mortal, and Henderson died in consequence of improper treatment by his physicians, and not of the wound, then the jury will find the defendant not guilty.

"13. If the testimony should show that the wound, as alleged, was inflicted by the defendant upon the head of the deceased, and that on a subsequent day, and before the death of said Henderson, the physicians, in mistake as to the nature of the injury, operated upon the back part of the head of the deceased, and in so operating inflicted injuries to the head and brain of the deceased, and that the death of the said Henderson occurred on January 24, from the joint effect of said wounds inflicted by defendant and by the physicians, *then* the jury must be satisfied from the testimony that the wound inflicted by the defendant was clearly a sufficient cause of the death without the concurrence of that by the physicians, and if the jury so find they will find the defendant guilty. But if the death of Henderson is shown to have been caused by the joint effects of the wound inflicted by the defendant and that inflicted by the physicians, and it should not be made clearly and satisfactorily to appear that the wound inflicted by defendant was sufficiently a cause of the death of Henderson, then the jury should acquit the defendant."

Do these charges of the learned judge inform the jury correctly of the rule by which they are to be governed in determining whether or not defendant destroyed the life of the deceased, Henderson? We are of the opinion, keeping the facts of the case upon this point before us, and as directly applicable thereto, these charges, taken together, contain a full, clear and concise statement of the law, and that there is no error apparent to us.

But suppose, it may be asked, that there was gross negligence or manifestly improper treatment by the attending surgeons, the wound not being necessarily mortal, can the defendant be convicted of the homicide? Now, before proceeding to answer this question, we desire to make these observations:

1. A wound is mortal when beyond the skill of surgery. It

is mortal, because death is inevitable from the nature of the wound.

2.   A wound is mortal unless relieved by surgery.   Now, if A inflicts a wound upon B from which there is no chance of recovery, aided by the most skillful surgeon, and B dies, A is guilty of the destruction of B's life.   But suppose that A inflicts a wound upon B from which he might be relieved by rational surgery, but, unless aid is given, B must, from the very nature of the wound, die, and aid not being given, B dies. will any rational mind question the fact that A destroyed B's life?   The condition in which A placed B is that which must lead to death, and that which did lead to death.   Now, can it rationally be contended that, as B, by proper treatment, might have been relieved, therefore A did not destroy B's life—that A did not kill B?   Who will assert such a proposition?   If, therefore, A did kill B, must he escape because of the gross improper treatment of the surgeons, when in fact he destroyed the life of his fellow man?   The plainest principles of justice revolt at such a conclusion.   On the other hand, suppose that the wound or injury inflicted, in conjunction with the improper treatment, produced the death, the wound not being necessarily mortal, should the defendant be held responsible for the homicide?   Clearly not, nor is he so held in the charge of the court, the jury being told in the charge, under this state of case, to acquit.

Again it is urged, as there is evidence tending to show that the wounds inflicted by the surgeons weakened the patient and lessened his vitality, that although the wound inflicted by defendant destroyed the life of the deceased, that being aided in this manner by the wounds inflicted by the trephining operation, the defendant cannot be held responsible for the homicide.   This proposition is not supported to its full extent by evidence.   Doctor Wooten swears that the patient was weakened, and that his vitality was lessened, but he is very clear and positive that the patient died of the wound given by the defendant.   And not only so, the evidence is conclusive that of this wound death was inevitable, unless relieved by surgery, and, to produce death, the wounds inflicted by the surgeons in the trephining operation would have required several days time.

We must not lose sight of the plain and practical question, which is: Did defendant, unaided, destroy the life of the deceased Henderson?   If he did, he should be held responsible for the homicide.   If not, there being evidence of gross negligence,

and manifestly improper treatment by the surgeons, he should not. This question, we think, in all phases was correctly submitted to the jury by the very clear and concise charge of the learned judge who tried this case. It follows that, if the charge of the court was correct, full and complete upon this subject, there was no error in refusing the charges requested by the defendant.

Other objections to the charge have been considered by us, but we do not think them well taken.

For the error in the charge of the court relating to implied malice, or murder in the second degree, the judgment is reversed and the cause remanded.

WILLSON, JUDGE. Whilst concurring in the disposition made of this case, I do not agree to that portion of the opinion which approves as correct law the twelfth and thirteenth paragraphs of the charge of the learned trial judge, and which are quoted at length in the opinion of Judge Hurt.

In order that my views may be properly presented and understood, I will first refer to and state the common law upon the subject embraced in the said paragraphs of said charge, and then show wherein, in my judgment, the provisions of our Code upon the same subject prescribe rules in some respects essentially different from the common law, and from the charge referred to.

Mr. Greenleaf very tersely states the rule of the common law as follows: "If death ensues from a wound given in malice, but not in its nature mortal, but which being neglected or mismanaged, the party died, this will not excuse the prisoner who gave it, but he will be held guilty of the murder, unless he can make it clearly and certainly appear that the maltreatment of the wound, or the medicine administered to the patient, or his own misconduct, and not the wound itself, was the sole cause of his death; for if the wound had not been given, the party had not died." (3 Greenl. Ev., sec. 139.)

Lord Hale states it thus: "If a man give another a stroke which, it may be, is not in itself so mortal but that with good care he might be cured, yet if he dies within the year and day, it is a homicide, or murder as the case is; and so it has always been ruled. But if the wound be not mortal, but with ill appli-

cations by the party, or those about him, of unwholesome salves or medicines, the party dies, if it clearly appears that the medicines and not the wound was the cause of the death, it seems it is not homicide; but then it must clearly and certainly appear to be so. But if a man receive a wound which is not in itself mortal, but for want of helpful applications or neglect it turns to a gangrene or a fever, and the gangrene or fever be the immediate cause of the death, yet this is murder or manslaughter in him that gave the stroke or wound; for that wound, though it was not the immediate cause of the death, yet if it were the mediate cause, and the fever or gangrene the immediate cause, the wound was the cause of the gangrene or fever, and so consequently *causa causans.*" (1 Hale, P. C., 428.)

The foregoing quoted texts are fully supported by other distinguished authors upon criminal law, and by numerous adjudged cases, both English and American. (1 Russ. on Crimes, 505; Roscoe's Cr. Ev., 717; 2. Bish. Cr. L., sec. 635 *et seq.; Com.* v. *Green,* 1 Ashmead, 289; *State* v. *Scott,* 12 La. Ann., 274; *Com.* v. *Hatchett,* 2 Allen, 136; *Parsons* v. *The State,* 21 Ala., 300; *Livingston's Case,* 14 Grattan, 592; *Com.* v. *Fox,* 7 Gray, 585; *State* v. *Morphy,* 33 Iowa, 270; *Regina* v. *Holland,* 2 M. & Rob., 351; Allison's Cr. L. Scotland, 147.)

This common law doctrine has likewise been quoted and approved by this court, but in the cases in which this was done it does not appear that the question presented in the case now before us was raised or considered. I do not, therefore, regard the questions as having been directly passed upon and determined in either of those cases, or in any other case decided by this court. The two cases I allude to are *Williams* v. *The State,* 2 Texas Court of Appeals, 271, and *Powell* v. *The State,* 13 Texas Court of Appeals, 244.

As I understand the twelfth and thirteenth paragraphs of the charge of the court, which are approved by Judge Hurt, they are a substantial enunciation of the common law upon the subject under consideration. This being the case, the same are correct, unless the common law has been changed by the provisions of our Code. I will now proceed to point out wherein, in my opinion, the common law with reference to this subject has been materially changed, modified and ameliorated by our statute. I will first quote at length the articles of our Penal Code bearing upon the question. They are as follows:

"Article 546. Homicide is the destruction of the life of one

human being by the act, agency, procurement or culpable omission of another.

"Article 547. The destruction of life must be complete by such act, agency, procurement or omission; but, although the injury which caused death might not under other circumstances have proved fatal, yet if such injury be the cause of death, without its appearing that there has been any gross neglect or manifestly improper treatment of the person injured, it is homicide.

"Article 548. The foregoing article, in what is said of gross neglect or improper treatment, has reference to the acts of some person other than him who inflicts the first injury, as of the physician, nurse or other attendant. If the person inflicting the injury which makes it necessary to call aid in preserving the life of the person injured, shall wilfully fail or neglect to call such aid, he shall be deemed equally guilty as if the injury were one which would inevitably lead to death."

It is to be noticed that there is a difference, though perhaps not a very material one, between the definition given at common law of "homicide," and that given in our Code. Blackstone defines it as "the *killing* any human creature." (4 Black. Com., 177.) Hawkins defines it "the *killing* of a man by a man." (1 Hawk. Pl. Cr., C. 8, sec. 2.) Our Code is more specific, and states it to be the *destruction* of the *life* of one human being, by the *act, agency, procurement* or *omission* of another. And it goes still further and requires that the *destruction of life must be complete;* not only so, but must be complete *by the act, agency, procurement* or *omission* aforesaid—that is, it must be complete by the act, etc., of the defendant. I find no such special requirement as this in the common law, though it may perhaps be embraced within the general rules on the subject. I have merely called attention to these differences to show that our Code upon this subject is by no means an exact copy from the common law, but contains some things which are not expressed so fully, if expressed at all, by the common law writers.

I come now to the most material points involved in this contention. What is meant by the words "but although the injury which caused death might not, under other circumstances, have proved fatal," used in Article 547 above quoted? In my judgment they refer to *all* injuries which are not of themselves inevitably fatal, or which are not inflicted under circumstances which make them inevitably fatal. In other words, *all* injuries which under the circumstances of the particular case are not *neces-*

*sarily* fatal, but which may cause death. An injury which *must* cause death under any state of circumstances, such as the severance of the head from the body, the severance of the carotid artery, or the breaking of the neck, would not come within the meaning of the words quoted. For injuries of this character no legislation is required, because they cannot be affected either by cure or negligence, skillful or unskillful treatment. They produce death in spite of any human aid. But, if the injury be such that death is not a certain result thereof, if it be such that human aid and skill may prevent its fatal termination, then it is such an injury as the words quoted refer to. I need no better illustration of the idea I am endeavoring to express than the case before us. In this case the wound inflicted upon the deceased by the defendant was a *mortal* wound, but it was not *necessarily* fatal; it would not surely and inevitably produce death; it was within the power of human aid and skill, perchance, to prevent it from terminating fatally. It was, therefore, in the language of the statute, " an injury which might not, under other circumstances, have proved fatal." That is, this injury, if it had been properly treated, skillfully attended to, by those called to treat it, might have been cured and the life of the deceased saved. But if it had nevertheless produced the death, although by proper and timely aid and treatment death might have been prevented, still it would be homicide by the act of the defendant, *unless it should appear that there had been gross neglect or manifestly improper treatment of the person injured* by some other person than the defendant.

In my opinion, just here is the important change made by our statute in the common law. At common law the neglect or improper treatment *must produce the death* in order to relieve the person who inflicted the original injury from the homicide. Such neglect or improper treatment, and not the wound, says Mr. Greenleaf, must appear to be the sole cause of the death. Our statute, as I interpret it, does not require that the neglect or improper treatment should produce the death, either in whole or in part. If there be *gross neglect*, or *manifestly improper* treatment, either in *preventing* or in *aiding* the fatal effects of the injury, the death of the injured person is not homicide by the party who inflicted the original injury. To illustrate: If A should cut B with a knife, severing a small artery, this wound would not be necessarily fatal, yet it would certainly prove so

unless properly and promptly attended to. The injured party would surely bleed to death in a short time if left without proper aid, but with proper treatment the artery would be closed, the flow of blood thereby stopped, and death prevented. Now, suppose a surgeon is called to treat this wound, and, instead of attempting in any way to stop the flow of blood, he administers to the wounded man chloroform, and leaves him to bleed to death. Here would be gross negligence, manifestly improper treatment of the injured person, and yet the death of such person would be the result solely of the wound, and not of the neglect or improper treatment. At common law this would be homicide. Under our Code, in my opinion, it would not be homicide in A who inflicted the wound, but it would be homicide in the surgeon who permitted the man to bleed to death, when, by the exercise of proper care, and the use of well known and effective means, he could have prevented it. I think "gross neglect and improper treatment," as used in our statute, are not only such as *produce the destruction of life,* but are such, also, as *allow, suffer* or *permit* such destruction of life.

In this connection, and in support of my construction of these provisions of the Code, I call attention particularly to that portion of Article 548, which provides: "If the person inflicting the injury which makes it necessary to call aid in preserving the life of the person injured shall wilfully fail or neglect to call such aid, he shall be deemed equally guilty as if the injury were one which would *inevitably* lead to death." I find no such provision as this in the common law. What is the object of this provision? Manifestly it is to cause the person who inflicts a personal injury upon another to furnish such aid as may be necessary to prevent a fatal result of such injury. What is the effect of the provision? If the party who inflicted the injury wilfully fails to furnish the aid necessary, and the injured party dies from the injury, the injury is regarded as *inevitably fatal,* and no question as to neglect or improper treatment can arise in the case as a matter of defense. In such case he who inflicted the injury would not be excused of the homicide, even had the death in fact been produced solely by the gross negligence or manifestly improper treatment of those who had the treatment of the case. But, on the other hand, suppose there is no such wilful neglect of the defendant to call aid; suppose he promptly calls a surgeon who has the reputation of being learned and skillful in his profession, and suppose this surgeon grossly neg-

lects the case, or treats it in a manner manifestly improper, what then is the meaning and effect of this provision? In such case, in my opinion, the homicide is shifted from the defendant to the surgeon, and I cannot read these articles of the Code in any other light. The provision I have last quoted, it seems to me, is inconsistent with the common law rule, but harmonizes with and makes perfect the rule which, I think, is prescribed by the Code.

If, as contended, the author of the Code merely intended, in the three articles quoted, to declare the common law rule upon the subject, he certainly did not do so very clearly or forcibly, and yet among all the great productions there is not perhaps a more perfect work than our Penal Code. I am sure that those articles were intended to, and do, modify the common law rule, and to the extent that I have suggested, and consequently beyond the limits of the charge given to the jury in this case. In this connection I will say that our Supreme Court, in the case of *Brown* v. *The State*, 38 Texas, 483, in referring to said articles of our Code, said: "Our law undoubtedly changes the rule of the common law, the theory of which was that he who caused the first injury should be held guilty." The subject is not discussed in that opinion, nor are the changes referred to pointed out, and the case is only valuable for the purpose of showing that this is not the first time that the common law rule upon this subject has been challenged, and denied to be the law of this State. I do not wish to be understood as approving the changes in the common law rule which, in my opinion, have been effected by our statute. It is no business of mine whether such changes are wise or impolitic. My duty and my desire is to arrive at an understanding of the case *as it is*, not the law as I might wish it to be.

It is not a consequence of this view of our law that the defendant would escape all punishment for his criminal act. While he might not be guilty of homicide, he might yet be guilty of an assault with intent to murder, and might properly be convicted of such offense under the indictment in this case. (Code Crim. Proc., Art. 714; *Peterson* v. *The State*, 12 Texas Ct. App., 650; *Stapp* v. *The State*, 3 Texas Ct. App., 138.)

I think that the learned trial judge should have instructed the jury upon the law of the offense of assault with intent to murder, even under his view of the other law of the case. I presume he did not give such instructions because they were not requested, and for the further reason, perhaps, that he did not think the evidence justified them. I do not regard the evidence

as so conclusive in its nature, in regard to the cause of the death, as to exclude that issue from the consideration of the jury. It was a part of the defense that it was the gross neglect and the manifestly improper treatment of the surgeons that produced the death, and not the wound inflicted by the defendant. This was one of the issues presented by the defense. The State proved, by a number of physicians and surgeons who had examined the case, that, in their *opinions*, the wound inflicted by the defendant was the sole cause of the death. This evidence, it is true, was *competent* and *sufficient*, but it was *not conclusive*. It might be met, and, perhaps in the estimation of the jury, be wholly overthrown by other evidence in the case. The jury were the judges of the *credibility* of the witnesses, and of the *weight* of the testimony. Some of these *expert* witnesses who gave it as their opinion that the wound inflicted by defendant *alone* caused the death, had themselves inflicted mortal wounds upon the deceased. They had sawed twice into the back portion of the deceased's skull, and had taken out two pieces of the skull bone. These surgical wounds were in a very vital portion of the skull, and where the skull was perfectly sound. All the expert witnesses admit that these wounds were unnecessary, and were perhaps mortal wounds, but that, in their *opinions*, they did not cause the death. It seems to me that this evidence should have been submitted to the jury for their *opinion* in connection with instructions as to the law of assault with intent to murder. Under the charge as given to the jury, they had but one alternative, and that was to convict the defendant of homicide, or acquit him of any offense whatever. The charge of the court did submit to the jury the issue as to the cause of the death. Having done this, it seems to me to follow, as a matter of course, that instructions as to assault with intent to murder should have followed.

I must say, further, that I do not think the charge upon justifiable homicide is entirely correct. It required the defendant to resort to all other means except flight of preventing the threatened injury to himself before taking life, regardless of the imminence of his peril. I think the law upon this subject has been settled otherwise by several decisions of this court. (*Kendall* v. *The State*, 8 Texas Ct. App., 569; *Foster* v. *The State*, 11 Texas Ct. App., 105; *King* v. *The State*, 13 Texas Ct. App., 277.)

WHITE, PRESIDING JUDGE.   I have read with much considera-tion and great interest the very able opinions of my brethren as to the proper construction to be given the language of Arti-cles 547 and 548 of the Penal Code.   My conclusions are that the views expressed by Judge Willson are correct.   I am, therefore, constrained to concur in his opinion, however much I may doubt the wisdom or the policy of a statute which, in my humble judg-ment, properly admits only of such construction.   It does occur to me that if the injury which causes the death under the condi-tions named in the statute would only amount to homicide, with-out its appearing that there has been any gross neglect or im-proper treatment of the person injured, that then the converse of this proposition must also follow inevitably, viz: that, if it does appear that there has been any gross neglect or improper treatment of the party injured, by the physician, nurse, or other attendant, it is not homicide in him who inflicts the first injury. Our business is to interpret the law as we find it in the Code. With its policy we have nothing to do.

For the additional reasons stated in Judge Willson's opinion, the judgment should be reversed and the cause remanded.

*Reversed and remanded.*

Opinions delivered June 27, 1884.